RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

YI ZHANG LIN,

*Petitioner*,

*v.*

MERRICK B. GARLAND, Attorney General,

*Respondent*.

No. 22-3807

─────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 206 060 936.

Argued: May 17, 2023

Decided and Filed: September 1, 2023

Before: GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Henry Zhang, ZHANG AND ASSOCIATES, P.C., New York, New York, for Petitioner. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Henry Zhang, ZHANG AND ASSOCIATES, P.C., New York, New York, for Petitioner. John F. Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

## OPINION

─────────────

DAVIS, Circuit Judge. Yi Zhang Lin, a native and citizen of China, petitions for review of the Board of Immigration Appeals' ("BIA" or "the Board") final order affirming an immigration judge's ("IJ") denial of his requests for asylum, withholding of removal, and

protection under Article III of the Convention Against Torture ("CAT").  The question before us is whether the BIA's determinations are supported by substantial evidence.  As will be explained below, the BIA's rationale does not allow us to make that determination.  So we grant Lin's petition and remand for further proceedings.

## I.

### A.  Factual Background

Lin traveled to the United States from the People's Republic of China in September 2012. Claiming he suffered persecution in China, he applied for asylum, withholding of removal, and protection under CAT within a year of his arrival.  In 2016, the Department of Homeland Security ("DHS") initiated removal proceedings against Lin pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).  In 2019, Lin testified before an IJ regarding the merits of his application. The following is a summary of Lin's testimony.

Lin's girlfriend became pregnant in 2001, but the two could not marry because she had not reached legal marriage age.  Government family planning officials suspected that Lin's girlfriend was pregnant and went to Lin's home to search for her.  Lin told the officials that his girlfriend was not pregnant, but they proceeded to "slap[] [him and] kick[] [his] stomach and legs . . . [b]ecause they want[ed] to force [him] to confess the whereabouts of [his] girlfriend."  (R. 7, Administrative Record, at Page 95–96).  When Lin refused to share his girlfriend's whereabouts, the officials "started smashing [his] family's furniture," and "tor[e] the gate of [his] family's door."  (*Id.* at Page 81).  Lin's "mouth and nose were bleeding . . . [his] stomach was hurting[,] and [his] legs were full of bruises" after this encounter.  (*Id.* at Page 96).  Lin did not seek medical treatment for his injuries because he considered them "just light wounds."  (*Id.*).

Lin's girlfriend later gave birth in secret, and the couple went into hiding at Lin's sister's home in Fuzhou, China for three months.  However, local officials eventually discovered their location and took his girlfriend to be forcibly inserted with an IUD.  The government also imposed a fine of 40,000 yuan to obtain a household registration for their son, and a fine of 25,000 yuan for having a child out of wedlock which prevented them from marrying until they paid the fine.  Lin and his girlfriend could not afford to pay these penalties when they were

imposed. That said, they were later granted a complete waiver for their son's household registration fee under a one-time government amnesty program. Lin also concedes that he could now afford to pay the marriage fine if he were he to return to China, though he finds it unreasonable.

Ten years after his run-ins with local government officials relating to the circumstances of his son's birth, Lin began attending an "underground" Christian church after a childhood friend introduced him to Christianity. (*Id.* at Page 100). Lin was attending such a church gathering in August 2012 when the village cadre (the equivalent of police in Lin's small island village) showed up and arrested him. The cadre locked him in a very small room, interrogated him, and attempted to force him to name fellow church goers who had escaped. When he refused, the officials hit and kicked him. Lin's "mouth and nose were bleeding" and his "body was full of bruises" as a result of the beating. (*Id.* at Page 88). Lin managed to escape after three days of interrogation when his parents and girlfriend bribed a prison guard for his release. Lin then hid at his aunt's house in Fuzhou for 26 days before managing to flee the country. After he left China, Lin's parents told him that the village cadre continued to look for him "everywhere"—and that "they went to [his] parent's home and asked for [his] whereabouts." (*Id.* at Page 89). In 2017, Lin declined to attend his mother's funeral based on warnings from his father not to return to China because the village cadre continued to search for him. Lin also testified that, because he has been baptized and considers himself a "real Christian," he will continue to attend church services if removed to China because "church is [his] home." (*Id.* at Page 91).

**B. Procedural Background**

Following the merits hearing, the IJ issued a written decision denying Lin's requests for relief and protection. The IJ found Lin to be credible and afforded his testimony and documentary evidence appropriate weight. The IJ ultimately concluded that Lin did not demonstrate that the harm he experienced, on account of either his religion or his opposition to China's family planning policies, rose to the level of persecution nor that he had a well-founded fear of future persecution. The IJ also determined that DHS adequately established that relocation within China would be reasonable, and that Lin failed to rebut this evidence. His

request for asylum therefore failed.  Finally, the IJ concluded that Lin failed to establish eligibility for withholding of removal under 8 C.F.R. § 1208.16(b) or protection under the CAT.

Lin appealed these findings to the BIA.  In September 2022, the Board issued a separate decision adopting the IJ's factual findings, upholding her conclusions, and dismissing Lin's appeal.  This petition for review followed.

## II.

### A.  Standard of Review

This court has jurisdiction to review the final decision of the Board "affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture." *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005).  Where the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming, we review the Board's decision as the final agency determination.  *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).  To the extent that the BIA affirms and expressly adopts the IJ's findings, however, we also review the IJ's decision.  *Id.*  We consider questions of law de novo, but owe substantial deference to the BIA's interpretation of the Immigration and Nationality Act ("INA") and accompanying regulations.  *Id.*

We review findings of fact for substantial evidence.  *Gaye v. Lynch*, 788 F.3d 519, 525 (6th Cir. 2015).  Under the substantial evidence standard, we "defer to the agency's findings of fact if supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Id.* (quoting *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012)).  That is, "[t]o reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the [applicant] alleged."  *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005) (quoting *Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003)); *see also* 8 U.S.C. § 1252(b)(4)(B).

### B.  Asylum

The Attorney General has discretion to grant asylum if the applicant is a "refugee" as defined in the INA.  *See* 8 U.S.C § 1158(b)(l)(A).  A "refugee" is a person who is unable or

unwilling to return to his native country due to past persecution or a well-founded fear of future persecution on account of an enumerated protected ground, including religion or political opinion. *See id.* § 1101(a)(42). A noncitizen seeking asylum bears the burden of proving that he is a "refugee." *See Koliada v. INS*, 259 F.3d 482, 486-87 (6th Cir. 2001) (per curiam). Although a well-founded fear of future persecution is a basis for relief, an applicant is not eligible for asylum on that basis if he could avoid future persecution by relocating within his country of nationality, and it would be reasonable under the circumstances to do so. *See* 8 C.F.R § 1208.13(b)(2).

Persecution is not statutorily defined, but we have broadly explained that it involves "the infliction of harm or suffering by the government . . . to overcome a characteristic of the victim." *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009)). While we have found a single incident sufficient to constitute persecution, that incident must be severe. *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006). We have also emphasized that "[p]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)).

### 1. *Past persecution*

The BIA adopted and affirmed the IJ's findings—and independently reasoned—that the harm Lin experienced in China as to both his Christian practice and his violation of family planning policies fell short of persecution under the INA. We need not determine whether Lin suffered past persecution on account of his religion because, as explained below, the Board's conclusion that he failed to establish a well-founded fear of future persecution on this ground is an error that independently entitles him to a remand. But we affirm the Board's finding as to Lin's family-planning claim because the record does not compel a contrary conclusion. *See* 8 U.S.C. § 1252(b)(4)(B).

Lin asserts that he suffered past persecution for failing to adhere to China's family planning policies. In support of this claim, he testified that officials repeatedly sought him out to pay fines for his son's birth out of wedlock and household registration. But he acknowledges

that the last time a government official approached him about the household registry fine was ten years before he left China. And his son was ultimately able to register without payment under an amnesty program. Nothing in the record suggests that government officials imposed any further punitive measures for his refusal to pay the marriage fine, only that he and his girlfriend remained unable to marry. While "[e]conomic deprivation may rise to the level of persecution," this is only so "when the resulting conditions are sufficiently severe that they constitute a threat to the individual's life or freedom." *Al Qudah v. Holder*, 529 F. App'x 499, 504 (6th Cir. 2013) (quoting *El Assadi v. Holder*, 418 F. App'x 484, 486 (6th Cir. 2011)). Lin's circumstances do not meet this standard.

### 2. *Well-founded fear of future persecution*

Lin also contends that he would be at risk of future persecution if he were to return to China. An applicant may establish a well-founded fear of future persecution if he can show that his fear is both subjectively genuine and objectively reasonable. *See* 8 C.F.R. § 1208.13(b)(2); *Lumaj*, 462 F.3d at 578. Only the objective component is at issue here.[1] A petitioner can show that his fear of persecution is objectively reasonable by presenting evidence that he would be "'singled out individually' for persecution," *Trujillo Diaz v. Sessions*, 880 F.3d 244, 250 (6th Cir. 2018) (quoting *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004)), or by establishing "a pattern or practice of persecution" against similarly situated groups or individuals, *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005) (quoting *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004)). The Supreme Court has explained that a well-founded fear does not require that persecution be more likely than not. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) (using example of a one-in-ten chance of persecution to illustrate objective reasonableness). An applicant attempting to establish a likelihood of being singled out for persecution in their home country "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Trujillo Diaz*, 880 F.3d at 250 (quoting *Harchenko*, 379 F.3d at 410). And such fear must relate to the petitioner as an individual, and not simply to the general population. *Id.* However, even if an applicant meets this standard, he is still ineligible for

---

[1] The IJ found Lin's fear to be subjectively genuine, and the BIA's decision does not disturb that finding.

asylum if it would be reasonable under the circumstances to relocate within his native country to avoid future persecution. 8 C.F.R. § 1208.13(b)(2)(ii).

The BIA articulated two grounds for its conclusion that Lin lacked a well-founded fear of persecution: (1) Lin did not show either that he would be singled out for persecution in China or that there is a "pattern or practice" of persecuting Christians or those who oppose family planning policies in China; and (2) Lin could safely and reasonably relocate within China to avoid persecution.

The BIA reasonably concluded that Lin did not demonstrate a well-founded fear of future persecution based on his opposition to family planning officials. Lin remained in his hometown for ten years after the family planning fines with seemingly very little issue and did not claim to want more children. Thus, the record does not show that he will likely be singled out for persecution on this claim. Nor did Lin establish that China's treatment of those who similarly opposed family planning policies rises to persecution, or that it is sufficiently widespread to constitute a "pattern or practice." We find the BIA's determination well-supported by the record.

The same cannot be said for the BIA's finding that Lin has not demonstrated a well-founded fear of future persecution for his practice of Christianity.

In its decision, the Board agreed with the IJ that given the very large number of Christians in China, Lin's likelihood of future persecution is speculative, and that his detention ten years ago followed by local officials questioning his parents as to his whereabouts does not prove an objective fear of future persecution. The Board also found that Lin's testimony that he was able to use his passport to leave the country undermined such a finding.

On appeal, the government argues that Lin did not demonstrate that Chinese officials are likely to discover his religious activities given the large number of practicing Christians in China. But this argument favors the general over the specific: the record establishes that officials *already have* discovered Lin's religious activities, and that they have sustained a long-term interest in him.

Lin's father warned him not to return home to attend his own mother's funeral in 2017—some five years after his escape—because the local police continued to question his whereabouts. That local government officials sustained an interest in Lin so many years after his initial detention strongly indicates that they would continue to pursue their interest in him if he were to return. Indeed, Lin's girlfriend shared in a letter that after his escape, the village cadre threatened to "never let [Lin] go" once they apprehended him. Lin's father also submitted a letter in which he explained that the village committee told him that they would again detain Lin if he returned to China. Importantly, the IJ found Lin's testimony on these facts to be credible.

Lin's circumstances meaningfully differ from previous cases where we have upheld the BIA's determination that petitioners lacked a well-founded fear of future persecution. For example, in *Zhu v. Holder*, the petitioner admitted that no one had looked for him since his departure from China. 528 F. App'x 544, 546 (6th Cir. 2013). And in *Pilica v. Ashcroft*, a case on which the government urges us to rely, the petitioner failed to establish a well-founded fear of future persecution on account of his political opinion. 388 F.3d 941, 954-55 (6th Cir. 2004). But in that case, "[t]here [wa]s no indication that [the petitioner] [wa]s on some governmental blacklist," and the government had never sought petitioner out personally. *Id.* at 955. Consequently, Pilica's circumstances were insufficient to obtain relief since "the persecutor must be aware the [petitioner] possesses the relevant belief or characteristic, must have the capability of punishing the [petitioner], and must have the inclination to punish the [petitioner]." *Id.* (citing *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994)).

Unlike in *Zhu* and *Pilica*, the record here contains ample evidence that (1) government officials in Lin's home province possess an individualized interest in harming him, (2) this interest has endured over the years, and (3) officials would seek to detain him if he were to return. Both "we and our sister circuits have found a real threat of individual persecution when an applicant presented evidence describing threats of harm directed at the applicant." *Trujillo Diaz*, 880 F.3d at 250; *see Mapouya v. Gonzales*, 487 F.3d 396, 413 (6th Cir. 2007) (overturning BIA's ruling that the petitioner had no well-founded fear of future persecution, finding that it lacked substantial evidence, where the petitioner adduced correspondence from two independent sources evidencing a threat of harm to him); *see also Shardar v. Att'y Gen. of U.S.*, 503 F.3d

308, 316–17 (3d Cir. 2007) (reasoning that "it is hard to believe that a more particularized showing could be made" where evidence showed that the petitioner's alleged persecutors targeted his family and made a specific inquiry about the petitioner).

Moreover, even if Lin's experience of detention and violence at the hands of the village cadre in 2012 could not, standing alone, demonstrate past persecution, it remains probative of the individualized risk of harm that would befall him upon his return to China. *See Hoxha v. Ashcroft*, 319 F.3d 1179, 1184 (9th Cir. 2003) ("[T]hreats and violence [petitioner] experienced, although not sufficient to compel a finding of past persecution that would create a presumption in his favor, are indicative of his individualized risk of experiencing similar mistreatment if he returns to Kosovo."). It is difficult to imagine that a reasonable person in Lin's position, under the circumstances demonstrated in the record, would feel safe returning home. The determination that Lin failed to show a reasonable likelihood of individualized persecution in China is contravened by the record and compels us to conclude otherwise.[2]

### 3. Relocation

The Board and the IJ went on to independently determine that it would be reasonable for Lin to internally relocate in China. "An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country . . . if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii). Notably, where the alleged persecutor is the government, as here, it is presumed that relocation is *unreasonable* unless DHS establishes otherwise by a preponderance of the evidence. *See* § 1208.13(b)(3)(ii). To overcome this presumption, "the government must satisfy a two-part inquiry: (1) whether [t]he applicant could avoid future persecution by relocating to another part of the applicant's country, and (2) whether under all the circumstances, it is reasonable to expect the applicant to do so."

---

[2]The IJ found that Lin also failed to establish a nexus between his religious beliefs and the past harm that he suffered in China or future harm that he might suffer upon his return. Because the BIA upheld the IJ's denial of asylum without adopting or addressing this reasoning, the question of whether Lin's well-founded fear is "on account of" religion is not before us. *See Tomaszczuk v. Whitaker*, 909 F.3d 159, 167 (6th Cir. 2018) (holding that we have jurisdiction to review only those issues "properly presented to the BIA and considered on their merits" (citation omitted)).

*Juan Antonio v. Barr*, 959 F.3d 778, 795–96 (6th Cir. 2020) (internal citations and quotation marks omitted).

To overcome the presumption, DHS presented country-conditions evidence plausibly satisfying the first part of the inquiry.  State Department reports indicated that there were a large number of Christians throughout China and that Chinese police response to the unauthorized practice of Christianity varies.[3]  *See Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012) ("State Department reports are generally the best gauge of conditions in foreign countries.").  These reports undeniably paint a bleak picture for Christians throughout the country.  But the reports also show that some areas of China benefit from increased freedom of religion and less interference from government officials than others, or at least treatment falling short of persecution.  *See, e.g.*, *Ali*, 366 F.3d at 410 ("[H]arassment or discrimination without more does not rise to the level of persecution.") (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 389–90 (6th Cir. 1998)).

However, while the government's evidence suggests that some areas are safe from persecution, it says nothing of whether Lin's relocation would be *reasonable*.  In determining reasonableness of relocation, the BIA has been advised to consider, among other things, "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties."  8 C.F.R. § 1208.13(b)(3) (2019).[4]  The State Department reports shed little light on these reasonableness factors and the government offers nothing else.

---

[3]Lin asserts that since his initial briefing to the BIA, conditions in China have worsened for Christians and those opposing family planning policies.  In his brief before this court, he asks the court to consider this evidence, and alternatively, requests a remand to allow him to present this evidence.  But our appellate review is limited to the administrative record.  8 U.S.C. § 1252(b)(4)(A).  Moreover, if Lin wishes to demonstrate changed country conditions, his proper recourse is to request consideration of that evidence by way of a motion to reopen.  8 C.F.R. § 1003.2(c); *see, e.g.*, *Japarkulova v. Holder*, 615 F.3d 696, 702 (6th Cir. 2010).

[4]We apply the version of § 1208.13(b)(3) in effect at the time the IJ heard Lin's case.  *See Patel v. Gonzales*, 432 F.3d 685, 690 (6th Cir. 2005).

Lin also asserts that the BIA's decision suffers from a procedural defect. According to Lin, the BIA erred in failing to conduct a complete analysis as to which reasonableness factors are relevant and sufficient to prove that relocation would be reasonable. We agree.

In our review of the BIA's determination, "we look only at 'the basis articulated in the decision and we may not assume that the Board considered factors that it failed to mention in its opinion.'" *Preçetaj v. Sessions*, 907 F.3d 453, 458 (6th Cir. 2018) (brackets omitted) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004)). That said, in deciding the relocation issue, the BIA reasoned in full:

> We also affirm the Immigration Judge's finding that, despite the respondent fearing persecution from government actors, DHS showed that it would be reasonable for him to relocate within China, especially since there is variation in local officials' response to unregistered church attendance. *See* 8 C.F.R. § 1208.13(b)(3)(ii). The respondent does not meaningfully challenge this finding and conflates it with his CAT claim.

(R. 7, Administrative Record, at Page 5 (internal citations omitted)). This summary affirmance of the IJ's conclusion, with only one sentence in support, is insufficient to show that the BIA undertook the appropriate analysis. This is particularly true here, where the record provides no indication that DHS presented evidence of the reasonableness of Lin's relocation or that the IJ or BIA considered any such evidence. For example, neither the IJ, BIA, nor DHS specified even a general area in China where Lin could relocate. And instead, they broadly indicated that Christians are safer in "some areas" of China than others. This makes it difficult to see how the IJ or BIA considered the reasonableness of Lin's relocation. *See, e.g.*, 8 C.F.R. § 1208.13(b)(3) (2019) (advising adjudicators to consider "whether the applicant would face other serious harm *in the place of suggested relocation*" (emphasis added)). Further, the BIA's single sentence on relocation appears to conflate the reasonableness of relocating (which, again, entails various economic and socio-cultural considerations under the applicable regulations) with Lin's ability to avoid persecution by doing so. The IJ similarly only discussed the general prospect of Lin's safety elsewhere in China. And the evidence that DHS offered does not appear to go beyond broad discussion of religious freedom and family planning policies in China. It does not reach Lin's personal circumstances or considerations such as other ongoing civil strife, or whether the

"administrative, economic, or judicial infrastructure" in China would make Lin's internal relocation feasible. *Id.*

As our sister circuit recently put it, the circumstances here leave us with "too many danger signals suggesting the BIA has not genuinely engaged in reasoned decision-making." *Estrada-Cardona v. Garland*, 44 F.4th 1275, 1288 (10th Cir. 2022) (internal quotation marks omitted) (reasoning that despite petitioner's cursory argument before the Board, the appellate court was unable to discern the basis for the Board's decision).

We take care to note that we have never required a formal recitation of the reasonableness factors—and we decline to do so now. *See Korley v. Holder*, 425 F. App'x 485, 488 (6th Cir. 2011). Indeed, the regulation itself provides that the enumerated "factors may, or may not, be relevant, depending on all the circumstances of the case," and are not necessarily determinative of whether it would be reasonable for the applicant to relocate. *Id.* But here, where we are left with no indication that the BIA undertook the appropriate inquiry and significant indications that it likely did not, remand for full consideration is proper. *See, e.g.*, *Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) ("When the BIA does not fully consider an issue . . . a reviewing court 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed.' . . . '[T]he proper course, except in rare circumstances, is to remand to the [BIA] for additional investigation or explanation.'") (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006)); *Berhane v. Holder*; 606 F.3d 819, 825 (6th Cir. 2010) ("Deference . . . does not require upholding a Board decision without regard to whether there is a reasoned basis for it, and it does not require us to envision a rational explanation ourselves."); *see also Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1226 (11th Cir. 2006) (per curiam) (remanding where BIA did not consider any reasonableness factors in relocation determination); *Hagi-Salad v. Ashcroft*, 359 F.3d 1044, 1049 (8th Cir. 2004) (remanding because BIA's failure to interpret 8 C.F.R. § 1208.13(b)(3) was "an error of law which precludes . . . affirming the agency's decision"). We take no position on whether DHS can carry its burden to show that Lin could reasonably relocate. But on remand, the Board should undertake this review in consideration of all the circumstances—including the broad range of relevant factors under 8 C.F.R. § 1208.13(b)(3) (2019).

**C. Withholding of Removal**

Lin also challenges the BIA's conclusion that he does not qualify for withholding of removal. The BIA (and IJ) reasoned that Lin's failure to satisfy the lower threshold for asylum necessarily foreclosed a determination that he qualifies for withholding of removal. *See, e.g.*, *Namo v. Gonzales*, 401 F.3d 453, 456–57 (6th Cir. 2005) ("[F]ailure to meet the standard for asylum precludes eligibility for withholding of removal."). But because we remand for the Board to reconsider Lin's asylum claim, the Board should also consider on remand whether Lin has established eligibility for withholding of removal, if necessary. *See Juan Antonio*, 959 F.3d at 797-98.

**D. Convention Against Torture**

Finally, the Board independently concluded that Lin is not entitled to relief under the CAT. *See* 8 C.F.R. § 1208.16(c). Like withholding of removal, relief under the CAT demands a higher burden of proof than asylum. Here, Lin must have established that it is *more likely than not* that he will suffer *torture* at the hands of the government if returned to China. *See Marqus v. Barr*, 968 F.3d 583, 589 (6th Cir. 2020); *see also* 8 C.F.R. § 1208.18(a) (defining torture as the intentional infliction of severe mental or physical pain or suffering). Because the burden rested with Lin, and because he did not point to evidence indicating that it is "more likely than not" that he would be subject to any harm rising to torture as defined under the CAT, the Board's determination here is supported by substantial evidence.

**III.**

For the reasons stated, we grant Lin's petition for review in part, deny it in part, and remand for reconsideration consistent with this opinion.